Good morning, Your Honors. My name is John Clausen. I am an attorney from Midland, Texas, and I represent the plaintiff appellant in this case, Dana. She actually pronounces her name Talifer, which is a little unusual, but certainly phonetically is Taliaferro. I don't agree with or disagree with that at all. The issue, of course, before the court this morning is fairly straightforward, and it is whether or not a very, very strict zero-tolerance type of policy for sexual innuendo and joking, whether that in any way at all affects what a lot of the anti-retaliation provisions of Title VII come into play. Let me ask you, is there any evidence that your client had received a copy of the policy? Well, there's no evidence at all, because this was a 12b-6 dismissal. So there's been no evidence development at all in this particular case. It's certainly alleged in the complaint that that's what the policy says. I know that's what the policy says. But did she have a copy of it? Was she advised before she brought the lawsuit? It's not in the record, but she did, yes. What does this company do? How big is it, and what's the organizational structure? Well, it's not a large company. Mr. Johnson can perhaps speak to that. As I recall, it has around 40 or 50 employees. And Mrs. Talifer worked directly for Mr. Hobbs, who is the head of the company. She had a fairly high-level position herself in the company as controller. Mr. Hobbs was the boss. Mr. Hobbs was the one who signed the employee handbook at issue in this case. And Mr. Hobbs is, in fact, the one who sent the texts that are at issue here. As I was thinking last night about these issues, it perhaps is a little bit of a paradox that perhaps it's worthwhile thinking about why companies have zero-tolerance type policies like this. I certainly had one when I was with the Department of Justice. This Court may, in fact, have one that's very similar for its employees. I'm not certain, but it's certainly more prevalent these days, it seems, than perhaps was in the past. But why is that? I suspect that most companies have these kinds of policies in order so that problems can be nipped at the bud before they escalate into a substantive violation. In other words, companies want people to come forward, perhaps maybe even in some sense if it's not that big of a deal, but could become a big deal or could become a concern if it continues. But is there case law that says that those the presence of those policies morphs a claim that would be too weak into one that's strong enough? That's the question of the day. That's the crux of the issue. And I cannot find a single one. There's no question. There is no case that seems to address that point. Now, Mr. Johnson found a district court case from the Eastern District of New York, Brooklyn, I believe, in which the judge said, well, if it's — there is a reference to a zero-tolerance policy, not so much to what it says, but it essentially what the court — what that particular judge wrote was that, well, they proved up a violation of the policy. They haven't proved up a violation of Title VII. The law is what the law says. But I just don't think that that is a wise sort of policy here. All we're asking for is a chance for a jury to consider, under all the circumstances, which is exactly what this Court's pattern jury instruction suggests, whether a reasonable person in these circumstances would perceive this as a violation of Title VII or a sexual harassment type of scenario. Sotomayor, you acknowledge that the communication in and of itself was not sufficient. I agree with that, Judge. I'm not arguing otherwise. I didn't bring it as a Title VII case for that reason. And does it matter — I'm sorry, go ahead. Dr. Stewart. Does it matter that the firing came about after the threat rather than the report? It may. But again, those are factual — You're off the stage. Those are factual issues. I mean, nobody has been deposed in this case to talk about what the threat might have been, why these texts were sent, and the timing of them, and what happened in the conversation between them. That sort of — and these are such factually — can be very nuanced issues. We haven't even been allowed to get to that thus far, simply because the district court ruled that no — even if everything that Mrs. Talifer says is precisely accurate, that she was fired because she complained about it, it doesn't matter. There's no question Mr. Johnson will likely argue that there was another reason She was probably fired because she told her husband he freaked out, thought she was having an affair with her boss, and then threatened to do damage to the company. That's why I would have fired her. And there may be facts that are developed that way, but that is not necessarily — again, at the pleading stage, what a jury would necessarily have to do. I'm assuming that from the standpoint of your ethical responsibilities, if it were as Judge Clement suggests, you would not have advised the lady to bring the lawsuit, right? Yes. Thank you. Yes. We believe that she was fired because, in fact, her complaint made him uncomfortable. But there are, of course, alternate — always alternate explanations. And that's what we have juries to sort that sort of thing out. So basically, I mean, I would venture a guess that — I'm surprised this is just a company of 50 employees. However, I would venture a guess that they probably took some employee handbook off a shelf because they couldn't afford to have someone create a, you know, one out of whole cloth for them. And I would venture to guess that that comes from some big law firm that represents huge companies. And that zero-tolerance policies are probably the norm rather than the exception nationwide for precisely the reason you say. And therefore, is it not the case that in encouraging companies to nip sexual harassment or other kinds of harassment in the bud, you are, in fact, going to have that policy backfire if every employee who is the victim of an unwanted statement of some sort can use the instead of a shield? But I don't think that every incident where somebody complains necessarily leads to this big, ugly standoff. Well, if — I mean, suppose he — you know, suppose the boss had just said, that's a pretty dress you're wearing today. And she took that to be an adverse comment, which may be the case in New York, even if it's not in Louisiana and Texas, and says, well, you have a zero-tolerance policy. I'm suing. But I don't think that you would necessarily get to a suit. How would you not? I mean, they'd all go to — they'd all go to discovery, according to you, wouldn't they? No, because it wouldn't — that wouldn't be a lawsuit, Your Honor, because the conversation in an ideal world ought to happen is whether it's a comment about a dress, which, of course, saying you have a pretty dress today is different from saying you have a really pretty dress today. I mean, again, these are all very contextual arguments. What could — should happen, and I think what most companies want to happen is, let's talk about this. I'll be more careful. I'm sorry. I didn't mean to offend. I understand where you're coming from. Or alternately, maybe as an employee, you're making too big a deal of this, you know. But conversations, dialogue solves problems. What you don't expect, and I don't think it's reasonable for a plaintiff to expect, is that if you initiate some dialogue, just like what's in the employee handbook, that you are going to be terminated for that. And that's what happened here. This particular situation might have led to an apology, to all sorts of things. Mrs. Talifer loved her job. She wanted to keep her job. She liked her boss very, very much. And what really — it's the anti-retaliation law, which ought to prevent things from escalating the way it did, where somebody is basically thrown out the door because a particular boss possibly is uncomfortable because a female employee has pushed back concerning some texts. Well, what kind of opinion would you have us to write that would not open up the can of worms that Judge Jones describes, but still allows this particular lawsuit to proceed? How do you thread that needle? I just don't see the can of worms, Your Honor. I don't see this. We're jumping towards litigation about the underlying Title VII for every one of these cases. Well, what often happens in cases like this is that, you know, something occurs, the employee complains, the boss responds, and then for who knows what reason, the employee gets terminated, often having to do with — or at least in some of the cases we see issues of performance, and then files a retaliatory Title VII retaliation complaint. That does happen. And no question, those are worthless lawsuits. But that doesn't mean — They're not worthless because it takes thousands of dollars to respond and defend them. But some of these cases can be righteous, too. And it's not easy at the — just the pleading stage to know which category it falls into. To go back to the point, I truly don't see the can of worms. Well, the only — I think normally we wouldn't go off on the pleadings. But the facts here are undisputed about the nature of the conduct, as far as I know, and the fact that she was terminated two days later, and you acknowledge the only thing that distinguishes this is the existence of the zero-tolerance policy. That's correct. And there's no question if this Court holds that the zero-tolerance policy is of no moment at all — and again, this is ultimately for a jury to decide what meaning that particular had — meaning that policy had in terms of — So, I mean, the point is that no reasonable person — you know, yes, it affected her family life, and yes, she went in and complained, but she did not have a reasonable belief that she had a Title VII violation because of those things. So the only distinction you're drawing is that there's a zero-tolerance policy. Which gave her possibly a jury could conclude under all the circumstances that gave her a reasonable belief. Again, this is a jury issue that's given to the jury under this Court's own pattern jury instructions, and I think a jury could possibly balance it. What about the Supreme Court's case, that Clark case, that has that — that information — that business about making love to a mountain or the Grand Canyon or something in the Court? Yes. That just wasn't enough. That's — again, that by itself isn't enough. I don't know. I don't think there was anything in Clark concerning one of these zero-tolerance policies. And another distinguishing point I might make is, both in Clark and several of the cases that the appellee cites, these were remarks that were made not directly at an employee. And that possibly — But saying I want a hot date isn't exactly made directly at someone. It was a text sent directly to Mrs. Dellinger. I understand that. But still, you know, I have a — you know, I have a teenager — well, no teenager can afford a Corvette anymore, but, you know, it's a laughable comment. Well — To anybody over the age of 21. I don't know that Mrs. Tolliver took it that way, and certainly her husband didn't. I mean, this is West Texas. It read, at least to her husband and to her, I suspect she would testify, as, what is this? She didn't view it as a joke. She viewed it as very strange and very odd, which then led to the discussion. If it would have been clearly a joke, no question, probably she wouldn't have gone in the next day to discuss it with her boss. But again, these are factual — I'm sorry. The zero-tolerance policy requires that she report — she reported to the alleged offender. But when he fired her, he said, after the conversation about the husband freaking out and threatening physical violence or something to the company, then the boss says, I'm very uncomfortable or I'm bothered by this or something, you're fired. Well, I mean, I would — if I had an employee whose husband was threatening me, I'd fire him, too. So just because it all started, allegedly, with the driving by the house or your kid's own, blah, blah, blah, it didn't morph into enough, I don't think, to give her a cause of action, especially when you can distinguish the real facts. My time is up. Yes, you may answer. And the brief answer — and again, this is a text, and it actually says that this has all made me uncomfortable. He says that first, and then he goes on to talk about these threats. Again, these are fact-specific issues of meaning, which we traditionally look for juries to unravel. Thank you. Yes, sir. Mr. Johnson. Hi. Good morning. May it please the Court. Hunter Johnson for Apelli Lone Star Implementation and Literate Corporation. Your Honors, it appears that, since we're not arguing over whether or not this single text amounts to harassment, is this employee handbook. And I have a number of arguments as to why it doesn't make a difference. I have two main ones that you can take away. It shouldn't make a difference, for all the reasons you've been talking about and a few more I will add. But if you actually read the record, what's in the record, it doesn't make a difference. A zero-tolerance policy is not a harassment policy. They are two different animals, and we'll talk about that. A zero-tolerance policy prohibits conduct, a lot of conduct, lawful and unlawful. A harassment policy prohibits unlawful harassment, and I'll get to that in a second. The employee handbook, this is why it should not. It contravenes well-established federal law. It would create a new standard, a subjective standard, based upon the contents of an employee handbook, and we shouldn't go there. Justice Beyer in Burlington . . . Are you saying that the contents of an employee handbook could never create a viable claim? I'm not saying it could never. It certainly doesn't in this case because the contents are too generalized. I could envision a scenario that maybe they would if you had . . . maybe the employee handbook says, we're going to define harassment to include a whole list of things that may or may not be lawful or unlawful. So, isn't it possible that this isn't the seminal case to try to decide all the parameters of employee handbook and zero-tolerance is set on this alleged here . . . Zero-tolerance language. That's on the record on appeal at page eight. This is all that's in there. And these are . . . let me say, these are records. These are excerpts from the whole policy. This is not the policy. It says, aside from being callous, the substance of this message violated Lone Star's own policies. Okay, we'll violate . . . we'll get to that. Violation of your own policies does not amount to a violation of prohibited activity under Title VII. Then it goes on and says, Section 90 of Lone Star's employee handbook warrants that Lone Star has a zero-tolerance policy for sexual propositions, innuendo, suggestive comments, and sexually-oriented jokes and teasing. That's what the zero-tolerance policy says. It's not saying that's the harassment policy. It's just saying we have a zero-tolerance for that. What difference does it make whether they call that harassment or zero-tolerance under that? That tells you that that workplace is going to be really strict about such things, and it's not going to be one of those loosey-goosey workplaces where everybody's dating and sending sexual things to each other in their text all the time. I agree. And I think that . . . let's just talk about zero-tolerance policies for a minute. Zero-tolerance policies came into existence . . . they're rooted in the criminal justice system. They started showing up around 20 years ago. And what they reflect . . . it's a prohibition, is what that policy says, is that reflect a strong stance on specific types of conduct. You see it in the drugs. No drugs here on the premises, right? No theft and no violence. These policies typically prohibit all unacceptable behavior, even if it is not very serious or unlawful. That's the key point. It's not . . . doesn't have to be unlawful. It's a more restrictive policy than what harassment, unlawful harassment, is how that's defined under the law. But are you expecting, then, the layperson to say . . . to be able to parse between, well, this is against my company policy, but it's not against Title VII or whatever applicable law? I mean, you're expecting the layperson to be able to parse that at the time and also the person making the decision? I think you have to weigh between competing interests. I mean, yes, we do. And the courts that have grappled with that, as I cite in my brief, that there's been those Fifth Circuit. There's a case out of the Eastern District of Louisiana, George v. Diversified Foods and Seasonings. That was Justice Daniel Knowles was the justice who wrote that opinion. That was a 12B6 case. And that's a 2014 case. In that case, the plaintiff had complained of a romantic relationship between a supervisor and an hourly employee. That is not an unlawful act. It is maybe a violation of a company policy. She argued, the plaintiff, that the company policy prohibited sexual harassment and that the company would not retaliate against her for reporting the harassment. The court rejected this argument and ruled where there is no allegation in the complaint that she had either engaged in a protected activity or that she had suffered an adverse employment action because of such protected activity, she did not have a case. The more pertinent case, Judge Elrod, is this Watkins v. Fairfield Nursing and Rehabilitation Center. That is out of the Northern District of Alabama. It's a 2012 case. So that's at the Eleventh Circuit. This was also a 12B6 case. The plaintiff argued that she had an objectively reasonable belief that a supervisor's conduct had violated the law because the defendant's own handbook made the causal connection between the sexual relationship and the resultant sexual harassment. The court stated plaintiff was, quote, charged with knowledge of the substantive law. To answer your question, plaintiff should be charged with knowledge of the substantive law. The court then determined that based upon the clear holdings from the Eleventh Circuit regarding the conduct not being unlawful, that a reasonable person would not conclude that her supervisor's favoritism violated Title VII simply because her employer had adopted a more restrictive policy in its ethics handbook. Can I read, let me read you the, I think it cites a case for this that I thought was pretty good. Was this policy given out to the employees? Like, how did the plaintiff know about this policy if she'd been working there for years? That's not, it's not in the record that she, a couple of things, that she even knew about the policy or that there's nothing in the record that she actually read or consulted the policy before. Let me ask that. I mean, that's another point. The magistrate or the judge takes this in terms of A, Title VII retaliation and B, contractual violation of the employee handbook. Did the plaintiff make the argument in the district court that the employee handbook gave was a basis for her reasonable belief? Did he make that argument? The plaintiff did not specifically. We've argued waiver in there a little bit, but I'm not pushing it very hard. But that, it was more, there was a breach. Well, why not? Why aren't you pushing it? Well, I'm pushed by, it's in our brief, we should. She didn't, the argument that she's making today is not the same as what was argued in the response. And we have argued waiver on that. Well, the plaintiff is master of her complaint. Don't you think the plaintiff ought to be master, you know, confined to the arguments that they made, she made? I agree with that. But are you saying that, are you really sure about that? Both her complaint and her response to the motion to dismiss link the zero tolerance policy on sexual harassment to reasonableness under Title VII, and they do not compartmentalize like the magistrate judges. I was very puzzled by your waiver argument, because when I went back to look at it, it seemed that they were making the argument, and it wasn't hard to find. So it could be that the magistrate judge wrote it up like that, but that doesn't mean that that's neither here nor there on whether or not they made the argument. Right. I mean, I'm just, it's out there. I don't disagree with some of the things you're saying, because there's language in there where he says. There's language where he says it's related to the Title VII in his briefing, both in his complaint and in his response to the motion to dismiss. Right, right. So my point is that we don't even have to worry about the waiver, because this policy is more restrictive. It includes conduct that's not in itself unlawful, and that's what she was relying on. But that doesn't change the standard. This Court and the U.S. Supreme Court have set a very strict standard, a high standard, particularly when you have a single incident of alleged harassment. And it's a high standard, too, for that good faith belief, even though under retaliation you have to do that. Okay, so an employer, let me just walk through this. I don't think I disagree with you, but an employer could set a standard and say you can be fired from this place for doing this, even though this wouldn't be a violation of the law, because we want to stay way on the side of the law. But just because someone didn't get fired for doing it doesn't mean that they have violated the law vis-a-vis other people's rights to be protected from that conduct. Is that your position? It's too hard to follow what I just said. Yeah, well, my position is that when you have these policies that have conduct that is not unlawful, it might be a breach of the company's own internal policies, but it's not going to change the standard. The standard is you have to have an objective, and we know that term is in there, the Supreme Court and Burlington Northern. You have to have an objective, reasonable belief that unlawful employment practice has occurred. But failing to fire somebody in accordance with your handbook. The zero-tolerant, right. Doesn't mean that you violated the rights of someone else under Title VII. You could possibly do that, right. Under a zero-tolerance policy, you're reserving the right. It just goes back to these zero-tolerance policies. I think companies are trying to take, maybe they're being overprotective, but they're trying to take a very strong stance that is not only harassment, severe and pervasive. We don't want you talking, we don't want you teasing. That's what's in there, teasing. We don't want you stating innuendo and other conduct that doesn't rise to the level. We want you to just draw a wide line and stay away from all that. But that's what the, that's all that policy says, is that that's, that is prohibited in this workplace. Let's look at the policy again. It's not trying to define what sexual harassment is. And I know that's outside of the record, but it's, harassment is defined in the policy elsewhere that complies with Title VII. Okay? This is a separate policy that says we're not going to tolerate a whole range of behaviors. If you look at the anti-retaliation provision that she did pull, it says we won't retaliate for reporting harassment. Not innuendo, not teasing, not something that doesn't rise to that level. It's apples and oranges. That's, that's one of my arguments. Zero-tolerance policy is not an anti-harassment policy. I've not found any case law to say that. There's a lot of writers out there who say, you know, zero-tolerance policy. I looked up Cambridge Dictionary, and if you look it up in the dictionary, you will see part of that definition says it includes lesser conduct. It is a more restrictive prohibition. And therefore, you could terminate somebody under that. And it's not necessarily, they're hadn't violated the law or not. They're employees at will, right? You could let them go for that reason. What's your position on why she was fired? For threatening the, it's two, you got it right. I mean, it's in the record. The text says, her husband, who, we don't know why. I mean, the text is vague to begin with. I mean, it is. In fact, it is in the record. When she read it, she didn't even know what it meant. It was silly. She didn't know what it meant. She wasn't offended, right? She, the record says, I didn't even know what it meant. So I showed it to my husband. Sadly, the husband blew up and did have an unfortunate reaction. He then threatened the company, and that is in the record. He threatened, he said, I hope to see you fail. And as Mr. Appellant's counsel has stated, this lady is the number two person in the entire company. And so her husband has threatened you and your company to fail. This company does $20 to $40 million a year. She has unlimited ability to write checks and control, has the keys to the kingdom, so to say. He can't even talk to her, because if he does, her husband's going to accuse her of having an affair. I'd be uncomfortable with that. And I would be uncomfortable, and her husband's not engaged, threatening the company is not protected activity under Title VII. So that is really what, I mean, this is an interesting case, because you have, you know, even if it's a 12B6, the complaint contains what I believe to be a legitimate, non-discriminatory reason for letting her go. A defense. Yeah. So, I mean, she was a very high-level person. One thing I want you to look, focus on about this zero-tolerance policy, it does not define or alter the meaning or definition of what harassment is. It does not do that. If you read the policy, it just says this conduct is not permissible. It is not redefining harassment. It does not define or alter the definition or meaning of unlawful behavior. The policy does not define or alter the definition or meaning of prohibited conduct under Title VII. It just doesn't do it. And in order to use this policy, you have to read it out of context. It is not reasonable for a plaintiff to read a policy out of context to try to create a reasonable belief. That's not going to work. I do want to touch on a couple of things. It wouldn't be unreasonable if this actually did go to a jury, just hypothetically, for that policy language to be argued to the jury. Because the pattern jury charge, as was cited in the response to the summary judgment motion, which is one of the reasons why it's not waived, says the Fifth Circuit's pattern jury instructions for the propositions of reasonableness analysis must be based on all the mandatory zero tolerance policies set forth in the employee handbook. So that would be one of the circumstances it could be argued. You don't disagree with that, do you? I don't disagree. And initially, the appellant was saying, well, the judge never considered this. And I came back and said, no, wait a second. If you read his opinion, it says under all the circumstances. Presumably, he read the complaint, right? And presumably, he read our motion and their response. It's in there. And it's certainly in the complaint. It's not couched. I think it was really pled more as a breach of contract type fact. No, it would be a circumstance. But it's not enough of a circumstance to create a new standard on its own. A new standard under a bunch of years of precedent. And if you read it, if you really read it, it doesn't change anything. It's a zero tolerance policy. That's it. We don't tolerate this behavior. A harassment policy. Unwelcome. Severe and pervasive. A lot higher standard there. It just doesn't get there, I believe, in this case, is my point. And I want to talk about public policy for a second. I have four minutes left. I mean, so it's like, what are we trying to say? If you turn on the news, there's some companies, maybe like Fox News, who could possibly stand to have some zero tolerance policies if they don't already have those in place to draw some lines on what is unacceptable conduct. If the court rules that any company who has a zero tolerance policy is therefore subjecting itself to a lower standard for what a reasonable, objectively reasonable good faith belief is, are we not telling the court, every employer, that you can't have these zero tolerance policies anymore because it's going to backfire and we're going to punish you for doing so? And I agree, you're weighing, well, on the one hand, employees are out there saying, well, gosh, I'm confused by all this. But as I tell my, you know, 16-year-old daughter who's driving, if you get pulled, you know, if you get pulled over for speeding, telling the police officer that I didn't know what the speed limit is is not going to get you off the hook. We're charged with knowing what the law is and that's why we need to have laws and that's why we have laws. So you've got to balance plaintiff's argument, well, I didn't really know what I was doing or what this meant, to companies telling companies who, every company, that you can't have these zero tolerance policies. And I've been doing, I've been specializing in employment law for 25 years and I've read hundreds and hundreds of employee handbooks. I'm sure you all have too. It comes up in the decisions that you make. I have yet to ever see one employee handbook that's the same. Every one of them is different. Every one of them has different language and it's tailored to the company. Yeah, but they pull them off. I mean, surely a company this size had to pull something off the shelf. I agree with that. And as I draft employee handbooks, and sure, we have firm files, right, that we use and then we help them do that. Drafting precedents. Yes. Typically, well, typically you take the employee's, the company's own handbook and you gussy it, you know, you clean it up or you make it compliant with whatever state you're in and add federal law and check that out. I'm about out of time, but that's one of the, I think that's a significant factor is that we shouldn't be telling companies that a zero tolerance policy is going to land you in hot water and therefore we need to start backing these back out of the situation. And then also, you all have said time and again, we don't want to become a super human resources department. That's not our job. Our job is to decide the law. Well, the law is here. And I think what we're starting to do is wade into human resources, the company's own policies. I'm not saying it can never happen. What I'm saying is it doesn't, it shouldn't happen in this situation and under these facts. Thank you for your time. Thank you very much. May it please the court. I just have a couple of final thoughts. One of which is this, however the court writes this opinion and however it would ask that it write it with a mind towards having at least some degree of sympathy for employees in Mrs. Talafer's situation. I mean, we talk about everyone being responsible for knowing the law. I'm not an employment specialist. This is my very first client I ever had in private practice. I don't think I can sit here and tell the court that, well, I know the law. You worked for DOJ, I thought you said. I did, but in a criminal capacity. I didn't deal with these issues. I had to deal with them because I was the boss of an office and had these zero tolerance policies and films we had to watch defining what was sexual harassment, much of which we used to chortle about because it seemed so trivial. The court probably has its employees watch these same types of videos. But employees are in a tough, tough spot. How are they supposed to know precisely where the law is when, as counsel points out, there's so much stuff in the media, and I'm not arguing that has to have a legal consequence, but certainly, if you look at an employee handbook, that might make a difference in how you think about it. And I also want to emphasize that I don't think that every single complaint that might be brought because of a zero tolerance policy is going to lead to this world where we have endless lawsuits. Again, I think that's probably the minority of those cases. At DOJ, when we have problems and issues, we try to counsel. We try to work with the employees to increase understanding. Sometimes there's a misunderstanding between two people. That's the objective of the zero tolerance policy. I don't think most employees want to sue their employer. I just don't think that's the facts. And so, again, what all Mrs. Tolliver expected in this case is that she wouldn't be fired because she brought up a claim. Finally, Judge Clement's point that, you know, maybe it looks like she got fired because of the threats her husband made. Keep in mind, again, if I'm not mistaken, I believe that in a normal case, we would fall into the McDonnell Douglas sort of analysis where that possibly would be a pretext and wasn't the real reason that she was fired. And, again, on the pleadings, we can't even get that far. Mrs. Tolliver believes that she was fired because she basically stood up to her boss and said it wasn't cool, Mr. Hobbs, that you sent me these texts. And she just wants the chance to tell. JUSTICE GINSBURG Doesn't Title VII retaliation under the Nassar case, and I'm probably misremembering this, but isn't it a but-for standard? In other words, am I wrong? JUSTICE GINSBURG No, you're right. JUSTICE GINSBURG It's not a mixed-motive thing. JUSTICE BREYER You may be right, Your Honor. But, again. JUSTICE GINSBURG What would you lose on summary judgment anyway if, I mean, I'm not trying to be disrespectful. In this particular case, because there would be the elephant in the room that the husband threatened, and that would be the reason they would say. And so this case has this fundamental problem to it. That's no disrespect to you and your able lawyering. You may choose to answer that or not. JUSTICE SOTOMAYOR Well, it's going to be an issue, a factual issue. There's always lots of facts. If it's a but-for causation standard, and that's the intervening thing, and then they say that's the reason, I don't know that you can get to, well, that's really pretext for this other thing. JUSTICE BREYER But how do we know? Just because he says that's the reason doesn't mean that it actually was. We have a significant burden to get around that if they give a non-discriminatory reason, a non-anti-retaliatory reason for the fire. I don't disagree, but we just want a chance to develop those facts. It has been a pleasure to be before the Court this morning with my friend, Mr. Johnson, and I thank you for the Court's careful attention to this matter. JUSTICE GINSBURG All right. Thank you, sir. JUSTICE KAGAN Is that your brief? JUSTICE BREYER Oh, yes, it is. Thank you, Justice. JUSTICE GINSBURG The Court will stand in recess until 9 o'clock.